[Civ. No. 866.   Third Appellate District.—October 30, 1911.]

THE PEOPLE, by U. S. WEBB, Attorney General, ex rel. WM. SPIERS, Respondent, v. CHARLES A. LAWLEY, HARRY B. LAWLEY, ADA W. NEIL et al., Appellants.

TOLL ROAD FRANCHISE—GRANT TO PERSON "AND ASSOCIATES"—TRANS-FERS AFTER COMPLETION—DEATH OF GRANTOR—UNTENABLE JUDG-MENT IN QUO WARRANTO.—Where a toll road franchise was granted to a person named, "and such persons as he may associate with him," without limitation as to the time of the grant, and after the road was completed by himself he transferred interests to others, and had no interest therein when he died, and a judgment in *quo warranto* was based on the theory that the grant was of a mere license or personal privilege to collect tolls, which terminated with his death, it is held that such judgment and theory were un-tenable, and that such construction of the franchise would result in working rank injustice, and the destruction of valuable rights acquired thereunder, which no rational or well-poised system of laws ought to tolerate in any case or under any circumstances.

ID.—FRANCHISE "PROPERTY TRANSFERABLE" UNDER CIVIL CODE.—The franchise in question is "property" which "may be transferred"

within the meaning of section 1044 of the Civil Code, and like any other species of property, in the absence of an express provision of law to that effect, it may be transferred by a sale under execution in satisfaction of any judgment which might be obtained against the owner thereof. The power or right of the grantee to transfer or assign interests in the franchise is implied from the authority to "associate others with himself," which cannot be reasonably. done without assigning to such associates some interest in the franchise, which can be done as well after completion as before completion.

ID.—ESTATE IN FEE IN FRANCHISE AND TOLL ROAD.—A franchise of the nature of that here in question is held to be real estate, governed by the rules applicable to the transfer thereof, which passes by deed and descends to heirs like any other property; and the time to which the franchise here granted shall run, not being expressly limited by the grant itself, the effect of the franchise was to vest in the grantee and his associates, to whom he conveyed interests therein, an estate in fee in the franchise and toll road; or in other words, an estate in fee in the real property granted to them by the state.

ID.—CONSENT OF STATE NOT REQUIRED TO TRANSFER—POWER TO REGULATE FRANCHISE.—Though the state might have required its consent as necessary to any transfer of the franchise, yet as it has not made such requirement, either by express language or by necessary implication, the franchise may be transferred to any grantee or grantees without the consent of the granting power. But, nevertheless, the state always retains its power to regulate and control such franchises into whomsoever's hands or ownership the same may be transmitted, and may forfeit them for nonuse of misuse; and it therefore need not impose restraints upon their alienation.

ID.—ASSOCIATES NOT CONFINED TO CONSTRUCTION OF ROAD.—Inasmuch as, by the express terms of the grant, the associates are authorized to "construct and maintain a turnpike road," the associates are not necessarily required to be helpers in the construction of the road, but it is sufficient that they are made associates by transfer to assist in its maintenance after completion. Such persons are, within the meaning of the act, "such persons as he may associate with him," etc. The purpose of the franchise was twofold, viz.: 1. To construct the road; 2. To maintain or operate it. The state is as much interested in its maintenance as in its construction; and it would be unreasonable to say that he cannot take associates in its maintenance whose aid he did not require in its construction.

ID.—CONSTRUCTION AND EFFECT OF AMENDMENT TO CIVIL CODE—PRIOR GRANT IN FEE NOT FORFEITED.—The amendment of 1901 to section 516 of the Civil Code, requiring the owner of a toll road, in addition to the prior demand for affixing and keeping in a conspicuous place thereon "a printed list of the rates of toll levied and collected," to show also "the date when the franchise or priv-

ilege under which the right to collect tolls was granted," and also "the date at which rates of toll were last fixed by the supervisors," under penalty of the forfeiture of the franchise," cannot be said to be inherently unconstitutional; yet it is held that it is not to be construed as applying to the prior grant of such a franchise in fee as to which no limit is prescribed for its duration, and that such a franchise is not forfeited for noncompliance with such amendment.

ID.—REGULATION OF FRANCHISE BY RATE FIXING BODY.—The owners of the franchise for the toll road are entitled to only a reasonable return for their investment, and if they are charging such rates as will make the profits of the venture in one year equal to the cost of constructing and maintaining it, as charged by the respondents, the fault lies with the rate fixing body, and with no one else. (Opinion on Petition for Rehearing.)

ID.—FRANCHISE IN FEE FOR TOLL ROAD "PRIVATE PROPERTY"—REGULATION OF PUBLIC USE.—A franchise in fee for a toll road is "private property," within the meaning of section 1044 of the Civil Code, as much so as franchises authorizing the construction and maintenance of railroads, subject only to the restriction of governmental regulations of a public use. (Opinion on Petition for Rehearing.)

APPEAL from a judgment of the Superior Court of Lake County, and from an order denying a new trial. Thos. J. Lennon, Judge presiding.

The facts are stated in the opinion of the court.

Theodore A. Bell, John T. York, and Charles A. Shurtleff, for Appellants.

U. S. Webb, Attorney General, F. E. Johnston, and E. J. Talbott, for Respondent.

HART, J.—This is a proceeding in *quo warranto.*

The complaint charges that the defendants have "usurped, intruded into and unlawfully held and exercised," and so continue wrongfully and without right to exercise a certain franchise for the construction and maintenance of a toll road starting from a certain point in Napa county and extending into and terminating at a certain point in Lake county, and for the collection of tolls thereon, and asks the judgment of the court that said franchise be declared to have ceased and

terminated on the death of the original grantee, ''that the defendants herein be adjudged as usurping and intruding into and unlawfully holding said franchise,'' and that they be excluded therefrom, etc.

Judgment passed for the plaintiff, and this appeal is prosecuted by the defendants from said judgment and from the order denying them a new trial.

The franchise involved here was granted to one ''John Lawley and his associates'' by an act of the legislature of 1865–66. Said act reads as follows:

''Section 1. John Lawley, and such persons as he may associate with him, are hereby authorized to construct and maintain a turnpike road from Edward Ebey's residence, in the County of Napa, through St. Helena Cañon, and over the St. Helena range of mountains, to Sigler Valley, by Sigler Cañon, in Lake County, a distance of about twenty miles.

''Sec. 2. That said grantees, upon the construction and completion of said road, are hereby authorized to charge and collect such rates of toll for travel and passage upon the same, in the County of Lake, as the Board of Supervisors of said County may fix and establish, and in the County of Napa, as the Board of Supervisors of Napa County may fix and establish; and the said Boards of Supervisors shall have authority to regulate and charge such rates of toll annually.

''Sec. 3. The right of way for said road is hereby granted to John Lawley and his associates; provided, that in case the lands of private persons are taken for said road, the right of way may be obtained in the same manner and by the same mode of proceeding as is provided by law for railroad companies.

''Sec. 4. After the expiration of five years from the time of the completion of said road, the said Counties of Napa and Lake shall have the right to take, possess, and own said road, by payment to said grantees such sum as three appraisers, one to be selected by the Board of Supervisors of Napa County, one by the Board of Supervisors of Lake County, and one by the said grantees aforesaid, may determine the value thereof to be; and in case one of said parties should fail to select such appraiser after reasonable notice

so to do by the other parties, then such valuation as may be made by the two appraisers chosen as aforesaid.

"Sec. 5. The rights herein granted are conferred upon the express condition that said road shall be completed, with requisite and proper bridges, culverts and embankments, in good order, within two years from the passage of this Act." (Cal. Stats. 1865–66, p. 277.)

The legislature of 1867–68 amended section 1 of said act so as to read as follows:

"Section 1. John Lawley and his associates are hereby authorized to construct and maintain a turnpike road from Edward Ebey's residence, in the County of Napa, through St. Helena Cañon and over the St. Helena range of mountains, to a point in Loconoma Valley, where the road leading from Calistoga to Lower Lake intersects the road from Calistoga to Lakeport *via* Cobb Valley."

Lawley, the grantee, alone completed the construction of the road during the year 1868, and operated it alone, according to the findings, until March, 1871, when John Lawley, in consideration of the indebtedness owing by him to one William Patterson, executed and conveyed to the latter an undivided one-quarter interest in said toll road "and all the franchises and rights granted to him by the aforesaid acts of the legislature."

On the sixth day of January, 1877, John Lawley executed a conveyance purporting to transfer all his right, title and interest in and to the said toll road and the right to collect tolls thereon to one W. C. Watson, then cashier of the bank of Napa. The purpose of this conveyance was to secure said bank in a large indebtedness due from said John Lawley to said bank. Watson subsequently conveyed to the bank.

In the year 1880, so the court finds, "the defendants, Harry B. Lawley and Charles A. Lawley, who were then of the ages of twenty-one and twenty-three years, respectively, declared to their father, the said John Lawley, that they intended to leave home and work for themselves, and, thereupon, the said John Lawley, who was then insolvent, stated to said defendants that, if they would continue to assist him in the conduct and operation of said toll road, and other properties, then owned by said John Lawley, and assist him

in paying off certain indebtedness existing against said toll road and the other properties, he would give to each of them an undivided one-fourth of his interest in said toll road and franchises; whereupon the said defendants accepted said proposal, and from 1880 to the time of the death of the said John Lawley, they each contributed their labor and certain moneys toward the maintenance and operation of said toll road, and the other said properties, and assisted in paying off all indebtedness against the same.''

In the year 1884, ''William Patterson, by deed of conveyance transferred all his interest in and to said toll road, and the right to collect tolls thereon, to Cynthia A. Lawley, wife of said John Lawley,'' and thereafter said Cynthia A. Lawley died, administration was duly had upon her estate, and, under the decree of distribution therein entered, all her interest in and to said toll road and the right to collect tolls thereon was distributed to Charles A. Lawley, Harry B. Lawley, Ada W. Neal and Mary F. Patton, children of said John Lawley and Cynthia A. Lawley.

On the seventeenth day of August, 1889, John Lawley executed a conveyance purporting to transfer all his right, title and interest in and to said toll road, and right to collect tolls thereon, to his four children above named. .

There were some subsequent conveyances involving said franchise—one by the bank of Napa and one by a referee appointed by the superior court of Napa county in a certain action in that court between the children of John Lawley— but these are of no material importance in their bearing upon the questions presented here for decision.

John Lawley, the father of defendants, died some time prior to January, 1906.

The main contention of the respondent is that the life of said franchise was coextensive only with the lives of John Lawley and his associates, if any he had within the contemplation of the terms of the grant from the state, and that John Lawley having never had any associate or associates, said franchise ceased to exist immediately upon his death.

It is further contended that the franchise was forfeited by reason of the transfer of the same by John Lawley without

the consent of the state, and also by reason of noncompliance with the requirements of section 516 of the Civil Code.

The court found as a matter of fact as well as a conclusion of law that "John Lawley never at any time associated with himself in the construction and maintenance of said toll road any person or persons whatsoever."

The court further found that, while the defendants, Harry B. and Charles A. Lawley, "did affix, and at all times kept up, at or near the said toll gate on said toll road, a list showing the rates of toll last theretofore duly fixed and determined by the said board of supervisors of the county of Napa," they failed to comply with the provisions of said section 516 of the Civil Code, "other than as specified in this paragraph."

The judgment, however, is founded entirely on the fact of the death of John Lawley and the asserted termination of the franchise by reason thereof. .

The appellants contend that the franchise in question is property in the sense that it may be transferred the same as any other kind of property; that, there being no limitation provided in the franchise as to the time during which it should run, the state granted to John Lawley and his associates, if any he had, an estate in fee in said franchise and toll road; that, consequently, the franchise did not cease to exist or terminate with the death of John Lawley.

It is further contended that the grant, properly construed, contemplates that the "associates" of John Lawley are such persons as he might associate with him either in the construction or the maintenance of the toll road or both.

As to the claim that the franchise was forfeited by the failure of the appellants to comply with certain of the provisions of section 516 of the Civil Code, the position of appellants is that those particular requirements of said section with which the court found that they had omitted to comply, having been added to the section subsequently to the granting of the franchise, are, as applied to the toll road in question, in the nature of legislation impairing the obligations of a contract and are, therefore, void.

The theory upon which the issues were decided by the court below is predicated of the assumption that the fran-

chise granted by the acts of the legislature referred to is a mere license or personal privilege to collect tolls; but it is very clear to my mind that such a construction of such franchises as the one here involved would result in working the rankest sort of injustice in many cases. It would certainly open up opportunity for the destruction of valuable rights acquired thereby and thereunder, and this no rational or well-poised system of laws ought to tolerate in any case or under any circumstances.

If, for example, the life of the franchise here were intended to be determinable upon the death of John Lawley, assuming that he had no associates within the meaning of the grant, then, obviously, it would cease to exist however soon after the completion of the toll road—whether a year, a month or a day would be immaterial—that he might die. Thus it may readily be seen that, after he had expended thousands of dollars in the construction of the road, and perhaps created an indebtedness against it in necessarily borrowing large sums of money to build it, the franchise would cease to exist immediately upon his death, the rights acquired thereby would become vested in the counties through which the road traversed and Lawley's creditors whose money had been employed in the construction of the road perhaps left without resources from which they might recoup themselves.

It is a proposition within the compass of the common history of California that in the infancy of the state the only means of transportation, either of freight or passengers or as a means of traveling from point to point, were over the wagon roads constructed and maintained either by the taxpayers or private individuals or corporations organized for the purpose of building and maintaining such thoroughfares. Railroad transportation, as a financially feasible scheme, had, at the time of the granting of the franchise in question, scarcely more than entered the minds of the people of California as a serious proposition, and even now, in many of the mountainous regions of the state, it appears to be regarded as financially impracticable to build and maintain railroads. It goes without saying that the general prosperity of a state, if such prosperity would be developed and main-

tained up to the full measure of its capacity in resources, must depend very largely on whether all the sections of the commonwealth are brought into reasonably close touch with commercial, industrial and financial centers. Without wagon roads in the earlier periods of the state's history, commercial intercourse to any important extent between the people of the various sections of the state would have been impossible. In fact, public roads, even with all the facilities for railroad transportation which later years have brought to California, are an absolute necessity to the general welfare and prosperity. The building and maintenance of public highways is, under the most favorable conditions, a very heavy burden on the taxpayers, and it is safe to say that few, if any, of the roads originally established and maintained under a toll-road franchise, would ever have been constructed if the taxpayers had been required to bear the cost of their construction. In other words, to encourage and promote the building of highways, particularly in the earlier history of the state, it was necessary to grant toll-road franchises vesting the grantees with the right to build and maintain public highways and to enjoy the right to claim and appropriate to themselves the emoluments thereof as rewards or compensation for performing those public duties which it is the essential part of government to perform, but which it is often financially impracticable for the latter to execute. It was, therefore, in the pioneer days of the state, as, indeed, it is now as to counties, to which that power has been committed, where the necessity therefor is found to exist, only in line with an enlightened and necessary policy of the state to grant these franchises and thus minimize the difficulties of general commercial and business intercourse between the inhabitants thereof. The state should not, therefore, be deemed to have intended to so restrict or hamper the rights of its grantees under such franchises as to permit the destruction of those rights except upon very substantial reasons or for very material causes. In other words, while the general rule is that such grants are to be strictly construed, it should be a very clear case—one admitting of little, if any, doubt of the correctness of such a construction—of an intention on the part of the granting power to limit the life

of such a franchise upon an event which may happen at any moment, where, as here, there are no express words of limitation and no law, as now, expressly fixing the period of time during which it shall run, before a court should feel justified in declaring, as the result of a mere process of construction, that such a franchise has ceased to exist.

There is, as will be observed, no limit fixed by the grant upon the time during which the franchise involved here shall run, and the conclusion reached by the learned court below that it ceased to exist synchronously with the death of John Lawley proceeds from the theory that the franchise is a personal trust and, therefore, could not survive after the death of the person to whom the same had been specially granted.

In my opinion the question whether franchises of the character of the one involved here are assignable must depend upon the proposition whether they are *property* within the meaning of that term as used in section 1044 of the Civil Code, which provides that "property of any kind may be transferred, except as otherwise provided by this article." If the word "property" as so used was not intended to be broad enough to include franchises of the sort involved here, then, manifestly, the franchise under attack in this case would have to be construed and held to be a mere personal privilege or trust, and, assuming that John Lawley left no associate or associates within the meaning of the term "associate," as employed in the grant, the same expired and passed out of existence coincidently with his death. If, on the other hand, the franchise is property within the purview of section 1044 of the Civil Code, then, obviously, it is, like any other species of property, subject to transfer, and may be, even in the absence of an express provision of law to that effect sold on execution in satisfaction of any judgment which might be obtained against the owner thereof.

That the franchise in question is property within the meaning of section 1044 of the Civil Code is a proposition concerning which I entertain no kind or degree of doubt. While there are some early cases which seem to hold that ferry franchises are nothing more than a personal trust, and not the subject of levy, sale or delivery under execution (*Monroe* v.

*Thomas,* 5 Cal. 470; *Thomas* v. *Armstrong,* 7 Cal. 286; *Wood* v. *Truckee Turnpike Co.,* 24 Cal. 474; *People* v. *Duncan,* 41 Cal. 507; and *Gregory* v. *Blanchard,* 98 Cal. 313, [33 Pac. 199]), still, I think, there are other California authorities which support the view that they are real property, to be governed by the same rules by which other real property is regulated.

Indeed, I know of no principle or reason why they should be regarded in any other light. There are many reasons why they should be so classified and treated. While the government ought always to subject the exercise of such rights— rights flowing from the bestowal of certain functions of government upon corporations or natural persons—to such restrictions and regulations as will prevent their abuse or their use against the interests of the public, which they are created to serve, it will not render them practically worthless or undesirable by placing such unreasonable restrictions upon their exercise as to make it possible that rights acquired thereby and thereunder may be unjustly destroyed. To do so would inevitably result in greatly handicapping the government in the execution of its paramount end, viz.: The promotion of the safety, comfort, convenience, the prosperity and happiness of the inhabitants of the state. For who would ask for a franchise, the execution of the purpose of which would necessitate the outlay of a vast sum of money, if the privilege or right so granted could, upon the merest pretext, deduced entirely through construction, be divested and the property acquired thereby and thereunder practically confiscated?

It seems to me that the power or right in John Lawley to transfer or assign certain interests in the franchise here is clearly implied from the language of the grant itself. The person or persons whom John Lawley is thus authorized to associate with himself in the construction and maintenance of the road are not specifically named in the grant. Who they are or may be is a matter left solely to the determination or election of John Lawley. It is obviously true that John Lawley could not associate with himself another person or other persons in the construction and maintenance of the road without assigning to such person or persons some interest

in the franchise. This would, of course, be just as true before the construction of the road as after its completion, and if thus it is necessarily to be implied that he may assign certain interests in the franchise before the road is constructed, what language is there in the grant that may reasonably be so construed as to justify the conclusion that he was without right to assign such interests after the completion of the road? Of course, it will not be contended that the language, "and such persons as he may associate with him," means anything less than persons in whom he might vest an interest in the franchise. In other words, no one will say that the mere employment of persons to assist in the construction and maintenance of the road would amount to an association of such persons with Lawley within the contemplation of the grant.

But there are cases which sustain my position, and I will now refer to a few thereof.

Although, as I have shown, some of the California cases have declared that franchises of the character of the one concerned here involve mere personal trusts and others that they are real property, yet the question as it is presented in its present form has never before been urged and decided by the higher courts of this state. The precise question submitted here is, therefore, new in California.

But, as I have already indicated, I am in accord with those cases which hold that such franchises constitute property.

In the case of *Powell* v. *Maguire,* 43 Cal. 11, speaking of a ferry franchise, Justice Rhodes, in a concurring opinion, said: "I am of the opinion that the franchise in question is real estate; that in its transfer it is to be governed by the rules applicable to the transfer of title to other real estate."

It is held in the case of *Stockton Gas etc. Co.* v. *San Joaquin County,* 148 Cal. 314, [83 Pac. 56, 5 L. R. A., N. S., 174], that franchises authorized by section 19 of article XI of the constitution to lay pipes and conduits, or erect poles and supply the inhabitants of a city with artificial light are incorporeal hereditaments appurtenant to the land. The court says: "The principle that franchises of the character here involved are treated as incorporeal hereditaments finds ready support from the authorities," and in support of

this announcement it quotes approvingly from *Bowman* v. *Watham,* 2 McLean, 376, 3 Fed. Cas. No. 1740, in which it is decided that a ferry franchise is real property and passes by deed; that it ''is assets in the hands of heirs, and in all respects is subject to the laws which regulate real estate''; that ''there would seem to be no doubt that the ferry franchise, with all that belongs to it, may be taken by descent or by conveyance the same as other interests which pertain to realty. . . . In this respect no difference is perceived between a ferry franchise, the franchise of a toll bridge, a turnpike or railroad, or any other franchise of the same nature.''

In many of the other jurisdictions of this country the same rule is firmly established.

In *Wilmington & R. A. Co.* v. *Downward* (Del.), 14 Atl. 721, it is said that ''a franchise is property, and it cannot wantonly or of whim be taken away by legislative act and transferred to another.''

''A franchise,'' says the supreme court of Connecticut, [*Norwich Gas Light Co.* v. *Norwich City Gas Co.,* 25 Conn. 19], ''is property which may be transferred by sale or devise, and it will descend to heirs like other property.''

''The grant was of a franchise, which had the legal character of an estate or property. 'An estate,' said Chancellor Kent (3 Kent's Commentaries, 458) 'in such a franchise and an estate in land rest upon the same principle, being equally grants of a right or privilege for an adequate consideration.' '' (*Oakland R. Co.* v. *Oakland B. & F. V. R. Co.,* 45 Cal. 365, 373, [13 Am. Rep. 181].)

''A franchise,'' said Justice Daniel, in *West River Bridge* v. *Dix,* 6 How. (U. S.) 507, 534, [12 L. Ed. 535], ''is property and nothing more. It is incorporeal property, and is so defined by Justice Blackstone when treating in his second volume, chapter 3, page 20, of the rights of things. It is its character of property which imparts to it value, and alone authorizes in individuals a right of action for invasion or disturbance of its enjoyment. A franchise, therefore, to erect a bridge, to construct a road, to keep a ferry, and to collect toll upon them, granted by the authority of the state, we regard as occupying the same position, with respect to the paramount power and duty of the state, to promote and

protect, as does the right of the citizen to the possession and enjoyment of his land, under his patent or contract with the state, and it can no more interpose any obstruction in the way of their just exertion.''

In the same case, Justice McLean said: ''It is objected that this bridge, being owned by a corporation, and used by the public, does not come within the designation of private property. All property, whether owned by an individual or individuals, a corporation aggregate or sole, is within the term. In short, all property not public is private.'' (See *Welch* v. *County of Plumas,* 80 Cal. 338, [22 Pac. 254] ; *Lippincott* v. *Allander,* 27 Iowa, 460, [1 Am. Rep. 299] ; *Dufour* v. *Stacy,* 90 Ky. 288, [29 Am. St. Rep. 374, 14 S. W. 48] ; *Johnson's Appeal,* 95 Pa. 79 ; *Evans* v. *Hughes County,* 3 S. D. 580, [54 N. W. 603] ; *Greer* v. *Haugabook,* 47 Ga. 282.)

I could well rest the conclusion at which I have arrived that a franchise of the kind involved in the case at bar is property—real property—within the full meaning of section 1044 of the Civil Code, upon the foregoing authorities, by which the proposition seems to be conclusively established; still the case of *Lippincott* v. *Allander,* 27 Iowa, 460, [1 Am. Rep. 299], as to the facts, so closely resembles the present case that I feel justified in quoting from the opinion therein *in extenso.* The Iowa supreme court in that case, among other things, says:

''But one question is presented by the record for our determination; it is this: Is a ferry license vacated or the franchise lost by the death of the party to whom it was granted?

''The right acquired under a ferry license is called a franchise, and is conferred by grant from the government, and with an implied covenant, on the part of the government, not to invade the right vested, and, on the part of the grantee, to perform the duties and conditions prescribed by the grant. . . .

''The fact that it is conferred by grant from the government, and may be forfeited for misuser or nonuser, does not argue that it is not property, or that it may be lost in a way or manner which will not deprive the owner of other property or his rights therein. . . .

"Hence, it is thought that the death of the grantee terminates the franchise. The answer to this is, that if the person exercising the franchise fails to perform the duties appertaining thereto, the license, by proper proceedings, may be revoked. (Rev., sec. 1212.) And that this position of appellee is not in accordance with the policy of our statutes is made very plain, by the provisions permitting and regulating the sales of the franchise upon execution. In such case the purchaser, by substitution, assumes the duties of the original grantee, and acquires all his rights. No reason can be given why the law will permit this, and yet prohibit the exercise of the franchise, in case of the death of the grantee, by his representatives. The doctrine contended for leads to another inconsistency, namely: the franchise may be subjected to the payment of the debts of the grantee in his lifetime, but is not assets for the payment of the same debts after his death.

"The grant of a ferry franchise is made for a specified time, not less than three nor more than ten years, with no reservation that it shall terminate upon the death of the grantee. Being, as we have seen, property, it would not, upon every analogy of the law, be lost by the death of the grantee. At common law it was granted as other real property, in estates for years, for life, or in perpetuity, and was so held. Under our statute it is granted in an estate for years only; and the death of the grantee can no more terminate it than the death of a tenant can terminate a like estate in lands.

"The above hardship and injustice of the rule contended for support a powerful argument against it. These franchises often require great outlays for boats, improvement of roads, etc., in order to render them remunerative to the owners, and useful to the public. The property thus acquired is valuable only in connection with the franchises; and, if they are forfeited by the death of the grantees, great loss and gross injustice would thus be wrought their estates. The doctrine contended for by defendant's counsel is not supported by the authorities they cite, viz.: *Munro* v. *Thomas,* 5 Cal. 470, and *Thomas* v. *Armstrong,* 7 Cal. 286.

"These cases hold that ferry franchises are not the subjects of levy and sale under execution. The decisions appear to be based upon the grounds that a ferry franchise

involves a personal trust, granted by the sovereign, upon conditions imposed upon the grantee alone; and his liability cannot be removed by substitutions. Such sales, as we have seen, are recognized by our statutes, and the ground of these decisions seems to be unsupported by reason and principles of law.''

It thus being clearly established that the franchise involved here is property in the sense of that term as it is used in section 1044 of the Civil Code, it follows, of course, that, under the provision of said section, it is subject to all the rights and burdens of property of any other kind, and that it may be transferred by assignment or by any other authorized mode of transferring real property; or, under section 388 of the same code, or, as stated, even in the absence of any such a provision, it may be levied upon and sold under execution, for the satisfaction of any judgment against the owner or owners thereof, ''in the same manner, and with the same effect, as any other property.''

The conclusion to which the foregoing views irresistibly lead is that, the time to which the franchise here shall run not being expressly limited by the grant itself, the effect of said franchise was to vest in John Lawley and his associates an estate in fee in the franchise and the toll road—in other words, an estate in fee in the real property so granted to them by the state. (Civ. Code, secs. 1072, 1105.) This being true, and since there is no provision in the grant itself or of any statute to which my attention has been directed expressly requiring that the consent of the state shall first be obtained before the right to sell or transfer the franchise may be exercised, manifestly said franchise may be transferred without the consent of the granting power. I do not, however, intend to be understood as holding that the state could not have made the procurement of its consent a prerequisite or a condition precedent to the exercise of the right by the grantee to transfer the franchise; but the state has not done so in this case by express language or by language reasonably capable of the construction that such was its intention. The state always retains or reserves the power to regulate and control such franchises wherever they may go

or to whomsoever's hands or ownership they may be transmitted, and its chief and, indeed, only concern with regard to such grants is that they shall not only be used for the purpose which they are created to subserve, but so used as not to injure the public or trespass upon its rights. Having this power of supervision or control over such grants, the state may forfeit them and all rights acquired thereby where they are not used or where they are misused. There is, therefore, no necessity for imposing restraints upon or in any way fettering the power of alienation as to estates thus created and thus rendering their value as property exceedingly precarious.

While the result at which I have arrived is, manifestly, decisive of this case, still I can conceive no impropriety in saying that, in my opinion, the court erred in finding that John Lawley "never associated with himself in the construction and maintenance of said toll road any person or persons whatsoever." This finding obviously involves a conclusion of law as well as a finding of fact, since necessarily it is founded on a construction of the legal effect of the language of the grant.

The act, as we have seen, provides that "John Lawley, and such persons as he may *associate* with him, are hereby authorized to construct and maintain a turnpike road," etc.

The respondent contends, as we have seen, that the term "associate," as it appears in the act, contemplates only such persons as John Lawley might have associated with himself in the *construction* as well as the *maintenance* of the road. In other words, it is insisted that unless John Lawley associated with himself some person or persons in the *construction* of the turnpike, but constructed it himself without associates in that work, then he could not associate others with himself, within the meaning of the grant, in the *maintenance* of the road or after the completion of its construction.

Of course, the legislature had some material or important purpose in view when authorizing John Lawley, if he chose to do so, to associate others with himself in the execution of the terms of the grant, and I can conceive of no other object intended thus to be effected than that of clothing Lawley with the right to invoke assistance in the building and opera-

tion of the road in the event that he found himself unable, financially, to carry out the purposes of the franchise himself. The purposes of the franchise were twofold, viz.: 1. To construct the road; 2. To operate it. The contingency to meet which the provision was inserted in the grant authorizing Lawley to associate with himself other persons in the prosecution of the enterprise was just as likely to happen in the matter of the maintenance of the road as it was in the matter of its construction, and the state being equally as interested in its maintenance as in its construction, it would hardly be reasonable to hold that the legislature intended to say that Lawley could not take associates, within the contemplation of the grant, in the maintenance of the turnpike after its completion by him alone. A contrary view of this proposition would, it seems to me, necessarily involve an imputation to the legislature of a design to lay a trap by which the forfeiture of the franchise for nonuser might happen long before the grantee named in the franchise had been given an opportunity to reimburse himself for the financial outlay requisite to build the road.

Apart, therefore, from the consideration that the franchise and its essential concomitants are transferable the same as any other character of property and that Lawley, the named grantee, could consequently have taken in associates either in the construction or maintenance of the road or in both or have sold and transferred it altogether, even in the absence of a provision in the grant authorizing him to do so, it is clear to my mind that the legislature intended to clothe Lawley with the right to take in associates in the prosecution of the enterprise at any time—*after* as well as *before* the completion of the turnpike. It follows, of course, that the appellants, although associated with John Lawley in the maintenance of the road after its construction, are, nevertheless, within the purview of the act granting the franchise in question, "such persons as he may associate with him," etc.

I am not prepared to say that the amendment by the legislature of 1901 (Stats. 1901, p. 5) of section 516 of the Civil Code would involve, if applicable to the franchise in question, legislation whose effect as so applied would impair the

obligations of a contract. The legislature has the undoubted right to subject the exercise of rights under all such franchises to reasonable regulation in order that the interests of the public may be fully safeguarded and protected, and such franchises are granted subject not alone to existing regulations but to such additional regulations as the granting power may deem proper and reasonable to impose subsequently to the granting of such privileges. I see nothing in the additional requirements prescribed by the amendment of section 516 of the Civil Code which is unreasonable or which could not be complied with without impairing in the slightest measure any rights which might have been acquired under the franchise involved here.

But I am of the opinion that the requirements of the amendment were not intended to apply to perpetual franchises or those as to which no limitation is prescribed as to their term of duration.

By said amendment, the owner of a toll road is required, in addition to affixing and keeping up, "at or over each gate, or in some conspicuous place, so as to be conveniently read, a printed list of the rates of toll levied and demanded," as said section formerly read, to show in and by such printed list, "the date when the franchise or privilege under which the right to collect tolls is claimed was granted and the term of duration of said franchise," and "the date upon which rates of toll were last fixed by the board of supervisors."

Said section further provides that "failure to comply with the provisions of this act shall work an immediate forfeiture of the franchise."

The court found, as we have seen, that the defendants "did affix and at all times kept up at or near the said toll gate on said toll road, a list showing the rates of toll last theretofore duly fixed and determined by the said board of supervisors," etc., but that they failed to show in said printed list the date when the franchise was granted or the term of duration of said franchise, and concluded, as a matter of law, that the defendants did not comply with the provisions of the section named.

The obvious object of the requirements of section 516 of the Civil Code is to prevent the public from being fraudu-

lently imposed upon or deceived by persons claiming the right without authority to collect tolls, or, having such authority, claiming the right to collect tolls in excess of the rates established by the board of supervisors. The importance in all cases of the provision as to the posting of the rates of toll fixed by the authorities is plainly apparent, but with respect to the posting of a notice showing the date when the franchise was granted and the term of its duration is important only in those cases where the term of duration of the franchise is limited to a specified number of years. In a case like the present, where the franchise is granted to exist perpetually, the public could not be imposed upon or deceived by the mere failure to publish, as required by the statute, the date the franchise was granted or the time during which it is to run. I am, therefore, of the opinion that the legislature did not intend that those provisions which have been added since the granting of the franchise in question should apply to such franchises as were granted by the state itself to exist for an indefinite period prior to the enactment of the amendment, but were inspired solely by the policy, since adopted, of limiting the life of all franchises to a definite number of years. In any event, the vital requirements of the section, so far as this franchise is concerned, having been observed by the defendants, it would certainly be a gross injustice to declare the franchise forfeited for the reason suggested, and particularly would this be true in view of the fact that no possible injury can result to the public from the omission to comply with the requirements referred to.

The summary of my conclusion is: That the franchise in question is property in the sense of that term as it is used in section 1044 of the Civil Code and is, therefore, subject to all the rights and burdens of any other species of property; that the appellants are not only the surviving associates of John Lawley within the meaning of the grant, but acquired title to the property—the franchise and the right to collect toll thereunder—through various *mesne* conveyances, assignments and other instruments in writing; that the franchise was not forfeited by reason of the noncompliance with

the requirements of the amendment of section 516 of the Civil Code.

The judgment and order are, therefore, reversed.

Chipman, P. J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on November 29, 1911, and the following opinion then rendered thereon:

HART, J.—The respondents have petitioned this court for the reopening of this cause and a reconsideration of the points originally urged by them in favor of the judgment. After an extended consultation the justices of this court have reached the conclusion that, upon a rehearing, there would be no likelihood of a recession from the result arrived at in the original opinion filed herein. We may remark, however, that we keenly appreciate the gravity and importance of the ultimate question submitted for decision in this cause, both in its legal aspect and in its effect upon the parties to the action, whatever may be the final decision; but, we may further observe, it is a source of much comfort to us to know that, if we have conceived erroneous views upon the legal questions, upon the solution of which the ultimate result must depend, there is another court that can correct the errors of our judgment.

It is said in the petition that "for over forty years these defendants have exacted tolls on this road"; that "at the present time appellants are bleeding the public and the public has no redress," and that "if the time has not come, it will soon come when the profits from this toll road will amount to more in one year than the whole cost of construction and repair." It must readily be admitted that these are considerations which should make it most desirable that the public should own the road, or that it should not remain in private hands, a consummation not at all adverse to our sentiments, if the conditions be as they are depicted in the petition, but learned counsel will not, of course, undertake to maintain that such considerations constitute a legal argument in favor or in support of the confiscation of private property or the destruction of vested rights, or that will jus-

tify the establishment of a principle or precedent that must of necessity operate most disastrously to the owners generally of such franchises. If the appellants are "bleeding the public"—a phrase that can imply nothing short of an accusation that they are exacting unauthorized and illegal tolls—the plain, ready and effectual remedy lies in a proceeding looking to a forfeiture of the franchise for a misuser of the right granted to them by the state. The boards of supervisors of the two counties into which the road extends have the power and it is their bounden duty not only to regulate the rates of toll, but to establish such rates only as are reasonable and just both to the owners of the franchise and the public. The owner of the franchise is entitled to only a reasonable return on his investment, and if the appellants in this case are now charging such rates as will make the profits of the venture in one year equal to the sum total of the original cost of the construction of the road and the cost of maintaining it, the fault lies with the rate fixing body in such cases and with no one else.

But counsel declare that our construction of section 1044 of the Civil Code is entirely too broad, "because it does not include or provide for the transfer of a franchise such as this"; that "the term 'property' as used in this section, refers to private property, and not to grants of public functions." We are unable to follow the argument that franchises such as the one involved in this controversy do not constitute private property. What are they if not private property? They are as much private property as franchises authorizing the construction and maintenance of railroads. There can be no distinction in principle between the two classes of franchises. It is true that they are charged with a public use and subject to the control, for the purposes of necessary and proper regulation, of the granting power and may be forfeited for misuser or nonuser, but, subject to these necessary restraints, they are as much private property in the hands of the grantees as is any other species of property. As stated in our former opinion, the state undoubtedly has the right to annex as a condition to the transfer of such franchises the procurement of its consent, but it did not do so in the case of the present franchise and in the absence of a pro-

vision expressly requiring that its consent shall first be obtained before said franchise may be transferred, there was, in our opinion, no necessity for such course to be pursued.

But, having fully presented in the original opinion filed herein our views on the questions discussed in the petition, there is no necessity for further consideration of them now.

As stated, feeling that further consideration of the cause or the points passed upon by us would not have the effect of changing or modifying our views, it will certainly save time to the parties and hasten a final decision, if the judgment of this court does not stand, by denying the petition and thus affording the earliest opportunity of getting the cause before the supreme court, if counsel choose to adopt that course.

The petition is denied.

Burnett, J., and Chipman, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 29, 1911.